UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| B.B., by his parents and next friends, ROBERT and KELLY BRUNES, | ) ) ] | |
| Plaintiff, | ) ) | |
| v. | ) ) | CASE NO. 1:07-cv-0323-DFH-JMS |
| PERRY TOWNSHIP SCHOOL CORP. and RISE Special Services Cooperative, | ) ) ] | |
| Defendants. | ) ) | |
| _____ | ) | |
| B.B., A MINOR, BY AND THROUGH HIS PARENTS AND LEGAL GUARDIANS ROBERT BRUNES AND KELLY BRUNES, | ] ] ] | |
| Plaintiffs/Counter-Defendants, | ] ] | |
| v. | ] ] | CASE NO. 1:07-cv-0731-DFH-JMS (consolidated into case above) |
| METROPOLITAN SCHOOL DISTRICT OF PERRY TOWNSHIP and RISE SPECIAL SERVICES, | ] ] ] | |
| Defendants/Counter-Claimants. | ] | |

ENTRY ON CROSS MOTIONS FOR SUMMARY JUDGMENT

These two related cases present a wide-ranging dispute concerning a public
school's special educational programs for a young child under the Individuals with
Disabilities Education Improvement Act ("IDEIA"), 20 U.S.C. § 1400 *et seq.*, the
federal implementing regulations, 34 C.F.R. § 300, and Indiana's regulations
governing special education, 511 Ind. Admin. Code § 7-1-1 *et seq.* After a hearing,

an independent hearing officer decided a host of issues and issued eleven numbered Orders that provided relief to the child and his parents. The parents then filed Case No. 1:07-cv-323 in this court to seek an award of attorney fees. In the meantime, the school district sought further review. The Indiana Board of Special Education Appeals ("BSEA") affirmed some of the hearing officer's Orders, revised some of the Orders, and struck some of the Orders. The child and his parents then filed Case No. 1:07-cv-731 seeking judicial review of the portions of the BSEA's decision in favor of the school district. The school district filed a counterclaim challenging other portions of the BSEA's decision in favor of the parents and child. The two cases have been consolidated here. At this time, the court addresses the merits of the challenges to the BSEA's decision. Attorney fee issues will be addressed at the next stage of this lawsuit.

As discussed in detail below, the court affirms the decisions of the Board of Special Education Appeals with respect to Orders 2, 3, 4, 5, 6, 8, and 11. The court finds that the issues raised in Order 7 are moot and therefore not justiciable. Each side's motion for summary judgment is granted in part and denied in part.

*Background*

Robert and Kelly Brunes are the parents of B.B., a minor child who attends the Jeremiah Gray-Edison Elementary School in the Metropolitan School District of Perry Township in Marion County.  The school district is a Local Education Agency ("LEA") that contracts with RISE Special Services to provide services for students identified as having special needs.  Indiana receives federal funds under the IDEIA and the Metropolitan School District of Perry Township and RISE Special Services (together, "the school district") are therefore obligated to comply with the substantive and procedural requirements of the IDEIA.  20 U.S.C. § 1412; *Beth B. v. Van Clay*, 282 F.3d 493, 497 (7th Cir. 2002).

The central purpose of the IDEIA is "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living."  20 U.S.C. § 1400(d)(1)(A).  The Supreme Court has defined a free appropriate public education (or "FAPE," for the cognoscenti) as a program specially designed to meet the unique needs of the student, supported by services needed to permit the student to receive some educational benefit.  *Board of Education v. Rowley*, 458 U.S. 176, 188-89 (1982).  School districts are not required to educate the student to his or her highest potential; it is sufficient to provide *some* educational benefit.  *Id.* at 200; accord, *Nein v. Greater Clark School*

*Corp.*, 95 F. Supp. 2d 961, 975 (S.D. Ind. 2000) (IDEA requires "meaningful education benefit," which was not provided to student with dyslexia who failed to make educational progress over three years).

The school district is responsible for tailoring its educational program to the individual needs of each student identified as having special needs, as reflected in an individualized education program ("IEP"). 20 U.S.C. § 1414(d). An IEP is a written statement developed for each school year by a Case Conference Committee ("CCC" or "the Committee") consisting of the child's parents, teachers, and other special education advisors. The IEP sets forth the child's present educational abilities, annual goals for improvement, and the individualized instructional methods and services needed to achieve those goals. 20 U.S.C. § 1414(d)(1)(A).

*Facts*

The independent hearing officer (or "IHO") issued detailed factual findings. The BSEA accepted the hearing officer's findings of fact, as does the court. See AR 37.[1] The school district first evaluated B.B. to determine his eligibility for special education services in 2000, when he was almost three years old and was making the transition from early intervention to early childhood services. His initial evaluations showed that his intelligence was within the low/average range,

---

[1]Before the IHO, the parents moved to clarify and/or correct what they perceived as errors in the findings of fact. AR 1703-25. The record does not show that the IHO ruled on their motion, and the parents have not pursued the factual challenge further before the BSEA or the court.

and he had delays in expressive language, readiness skills, and adaptive skills. AR 103. The Case Conference Committee for B.B. determined that he was eligible for special education services based on a communication disorder. He was placed in a special education preschool class for 2.5 hours per day, and he received 40 minutes per week of speech therapy. AR 103. The Committee renewed this IEP in January 2001 and January 2002. AR 104.

B.B. began attending the Jeremiah Gray-Edison School in 2002. The Committee determined on January 24, 2003 that he was still eligible for special education services based on a communication disorder. The Committee decided he would stay in his early special education preschool program but would move to a regular classroom with special education and related services for kindergarten. The Committee eliminated direct speech/language services from his IEP and replaced them with an obligation for the speech/language therapist to consult with B.B.'s teachers twice per month for 10 minutes in the classroom. AR 104.

On January 9, 2004, the Committee again found B.B. eligible for special education services based on a communication disorder. The only goals the Committee set for B.B. related to social communication. The Committee changed the IEP to require speech/language consultation only once per month for 10 minutes in the classroom. AR 105.

B.B. started first grade in August 2004.  His teachers reported that he had difficulty paying attention and socializing.  He exhibited strange behaviors, such as biting and licking his shirt, fidgeting, and talking to himself, and he had difficulty dealing with loud noises.  AR 105.  At the February 4, 2005 case conference, B.B.'s parents stated that they believed he had an auditory processing problem.  They requested testing in auditory processing.  The school district stated that it would perform cognitive, social, and academic evaluations and agreed to pay for a private audiology test.  AR 106.  The Committee determined that B.B. remained eligible for special education based on a communication disorder.  AR 106.

The private auditory processing evaluation was performed on February 22, 2005.  The evaluator found that B.B. had a poorly developed auditory system with difficulties in processing distorted speech or speech compromised by a poor acoustic environment.  The evaluator made recommendations for the parents and the school, including suggestions of programs, therapy, and accommodations in the classroom.  AR 106-07.

On February 24, 2005, the school's autism lead teacher observed B.B. in his classroom.  She noted that he often rocked in his chair, talked to himself, and picked at his fingers.  When redirected by a peer, he would put his arms straight to his sides, squeeze his eyes shut, and growl.  She noted that many

accommodations were in place to help B.B. succeed in the regular education classroom.  AR 107.

The school district also performed several evaluations and observed B.B. in his classroom environment.   The school's speech clinician performed a speech/language evaluation of B.B. on March 4, 2005.  The clinician noted that B.B. was distracted easily and made inappropriate comments.  She also noted that B.B. had problems with auditory number memory-backwards, sentence initiation, phonetic analysis, auditory interpretation of directions, auditory processing for thinking and reasoning, social or pragmatic language, initiating conversation, topic maintenance, paying attention to any topic except trains, scripting response to social issues, and understanding complexities, innuendoes, and subtleties in language.  AR 107.

The school psychologist performed an educational evaluation on March 24, 25 and April 6, 2005.  She noted that B.B. had difficulty staying on task and often fidgeted.  B.B. achieved a general intellectual ability score of 90, which is in the average range.  The tests showed that his non-verbal skills were superior to his expressive communication skills.  The psychologist noted that B.B. exhibited many behaviors associated with autism, including struggling with appropriate social interaction, emotional reciprocity, and flexibility.  AR 107-08.

The school district administered an Occupational Therapy (or "OT") evaluation on April 20, 2005. The evaluator noted that B.B. had trouble staying seated and often put objects in his mouth. He was distracted by visual and auditory stimuli. AR 108. The evaluator proposed 30 minutes per month of occupational therapy consulting services with B.B.'s teachers. AR 109.

After this series of evaluations, the Committee for B.B. convened on April 22, 2005 to discuss B.B.'s needs. School district staff members suggested that his eligibility classification be changed to Autism Spectrum Disorder (or "ASD"). The parents did not consent to this classification. Staff from the school district erroneously informed the parents that B.B. would not be eligible for certain services if he were not classified as having an Autism Spectrum Disorder. See AR 373-74. The Committee reconvened on May 24, 2005. The school district proposed an IEP with draft goals and objectives in areas beyond speech, but the parents did not consent to it. The parents agreed to continue with the IEP from February 4, 2005 that included a communication disorder eligibility identification. AR 109.

B.B. successfully completed first grade and moved to second grade. His second grade reading teacher noted that his skills were in the average range but he had difficulty paying attention and often chewed on things. AR 626-31. The teacher testified that she did not review B.B.'s IEP before she began teaching him and was not aware of any goals that had been set for him. AR 639.

The next case conference took place on November 11, 2005. The parents requested additional speech therapy and occupational therapy services based on evidence of an auditory processing disorder. The Committee changed B.B.'s services to 40 minutes per week of speech/language therapy and 30 minutes per month of occupational therapy consulting. The conference recessed to allow for goals in speech therapy and occupational therapy to be drafted. The parents never signed the proposed IEP. AR 110.

On March 2, 2006 the Committee met to revise the IEP. The Committee determined that B.B. was eligible for special education services under "Other Health Impairment" with a secondary disability of communication disorder. The Committee recommended daily inclusion in written language and math for at least 30 minutes each per day, direct speech services for 40 minutes per week, and occupational therapy consulting for 60 minutes per month. AR 111. The parents disagreed with the format of the IEP and believed that the goals and objectives were not sufficiently specific. The father met with some members of the Committee on March 17, 2006 to discuss his concerns. He signed the IEP on March 19, 2006, but he did not check off the statement that he agreed with it. He stated that he was signing it only because he wanted to avoid delays in implementing services. AR 111.

Though the Committee had agreed to occupational therapy at the March 19 meeting, the occupational therapist was not notified until April 12 of the need to

provide services.  She began providing services on April 15, 2006.  AR 113.  She also consulted with the general education teacher and developed a "sensory diet" for B.B., which allowed him to take breaks periodically and to use sensory calming materials.

After the March meeting, the special education teacher began working directly with B.B.  To prepare to work with him, she read his educational file, his IEP, and a short document about auditory processing.  She did not have special training about "Other Health Impairments" or auditory processing.  AR 111.  The school staff implemented a behavior modification plan.  B.B.'s teachers noted an improvement in his ability to pay attention and stated that he was making academic progress.  AR 112-13.

The school district held a conference on May 18, 2006 to discuss B.B.'s progress since the March IEP.  The parents raised the possibility of a private occupational therapist visiting the school to observe B.B., make recommendations, and train the staff.  They asked for an independent evaluation in speech and language.  They also asked for compensatory occupational therapy to make up for the sessions B.B. had missed due to the school's delay in providing services.  The school's special education director told the parents he would contact them within two weeks to discuss compensatory services, but he did not do so because of personal matters that arose.  The special education coordinator eventually agreed

to 30 minutes of direct occupational therapy services per month and an entitlement to five hours of compensatory occupational therapy.  AR 113.

On August 10, 12, and 14, 2006, Dr. Bubp, an independent psychologist selected by the parents, conducted a psycho-educational evaluation of B.B. at the expense of the school district. Dr. Bubp found that B.B. demonstrated odd phrasing and mixing of words, inflexibility of behavior, fidgeting, and difficulty paying attention.  His intelligence was in the average range, but he performed at a slow rate in reading and writing.  Dr. Bubp did not believe that B.B. fit the criteria for an Autism Spectrum Disorder, though he noted that some of B.B.'s mannerisms were the same as someone with autism or Asperger's Syndrome.  Dr. Bubp's diagnostic impressions were Cognitive Disorder NOS with deficits in speech production/expressive language development, Attention Deficit Hyperactivity Disorder, and impaired handwriting speed.  Dr. Bubp made 30 recommendations for how the school could accommodate B.B.'s needs.  AR 114.

Cathy Weinmann, an independent speech/language pathologist selected by the parents, evaluated B.B. on September 14, 2006 at the expense of the school district.  Ms. Weinmann found that B.B. had significant difficulty processing, discriminating, and interpreting information received through hearing.  He had difficulty focusing and completing activities, especially when there was background noise.  She recommended in-school speech/language therapy for 60 minutes per week and auditory therapy for 60-90 minutes per week.  She also

recommended private speech/language therapy and a computer auditory program. AR 115.

Collette Chinyerere, a private occupational therapist selected by the parents, evaluated B.B. on September 21, 2006 and observed him in his classroom on September 27 and 29 and October 5, 2006. Ms. Chinyerere opined that B.B. had difficulty with sensory processing. She recommended skilled occupational therapy once per week for 60 minutes. She noted that B.B.'s classroom had many visual stimuli that likely distracted him. She made many recommendations as to how the school could accommodate B.B.'s needs. AR 115.

*Procedural History*

On June 20, 2006, the parents filed a complaint with the State of Indiana alleging that the school district had failed to evaluate B.B. every three years. The state found no violation. AR 114. The parents requested a due process hearing on July 21, 2006. The Superintendent of Public Instruction appointed Dennis Graft to serve as an Independent Hearing Officer ("IHO") on July 24, 2006. The hearing took place on January 8-10, 2007, with many witnesses testifying. IHO Graft issued findings of fact, conclusions of law, and eleven Orders on February 5, 2007.

The school district appealed the IHO's decision to the Board of Special Education Appeals ("BSEA") on March 30, 2007, challenging some of the IHO's conclusions of law and Orders 1-8 and 11.  On May 11, 2007, the BSEA issued findings of fact and conclusions of law, along with a revised set of Orders.  The BSEA upheld Orders 1 and 11; struck Orders 3, 5, and 7; and revised Orders 2, 4, 6, and 8.

The parents and the school district both seek judicial review of the BSEA's decision pursuant to 20 U.S.C. § 1415(i)(2).  Both sides have moved for summary judgment, which is the procedural vehicle for asking the court to decide the case based on the administrative record.  See *Heather S. v. Wisconsin*, 125 F.3d 1045, 1052 (7th Cir. 1997).  The parties have filed the administrative record, including transcripts, testimony and documentary exhibits from the IHO and BSEA proceedings.  The court has subject matter jurisdiction under 28 U.S.C. § 1331 and 20 U.S.C. § 1415(i)(3)(A).

*Standard of Review*

Under the IDEIA, the BSEA's decision is the final administrative decision that is actually the target of the parties' requests for judicial review.  A party challenging an administrative decision under the IDEIA bears the burden of proof. *Alex R. v. Forrestville Valley Community Unit School Dist. No. 221*, 375 F.3d 603, 611 (7th Cir. 2004), citing *Heather S.*, 125 F.3d at 1052.  In determining whether

a party has met that burden, the reviewing court "shall receive the records of the administrative proceedings; shall hear additional evidence at the request of a party; and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate."  20 U.S.C. § 1415(i)(2)(C).

This statutory directive to consider additional evidence and to rule based on the preponderance of evidence places the court beyond the familiar boundaries for judicial review of administrative decisions.  It is not, however, a directive to hear the case *de novo*, disregarding the administrative results and considering the evidence as if for the first time.  The Supreme Court has made clear that the statute is not "an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review."  *Board of Education v. Rowley*, 458 U.S. 176, 206 (1982).  In *Rowley*, the Court construed the statute to require that courts give "due weight" to the administrative decision.  *Id.*

Under the "due weight" standard of review, the degree of deference owed to the administrative officer's findings varies according to whether the reviewing court has taken additional evidence not before the hearing officer, and also according to the significance of any evidence taken.  "At one end of the continuum, where the district court does not take new evidence and relies solely on the administrative record, it owes considerable deference to the hearing officer, and may set aside the administrative record only if it is 'strongly convinced that the

order is erroneous.'" *Alex R.*, 375 F.3d at 612, quoting *School District of Wisconsin Dells v. Z.S.*, 295 F.3d 671, 675 (7th Cir. 2002). The more the reviewing court relies on additional evidence, the less it is obliged to defer to the hearing officer. Judicial review is "more searching the greater the amount (weighted by significance) of the evidence that the court has but the agency did not have." *Id.*, quoting *Z.S.*, 295 F.3d at 675.

In this case, the sometimes slippery standard of judicial review under the IDEIA is easier to grasp because the parties have not submitted additional evidence and have not even challenged any of the IHO's factual findings, which the BSEA adopted entirely. Accordingly, the court gives considerable deference to the decision of the BSEA, as the highest state agency to have reviewed the case. The BSEA's decision must stand unless the court is strongly convinced that there has been an error.

*Discussion*

I.    *The Labeling Issue*

The school district argues that the BSEA erred by modifying and upholding the IHO's Order 4, rather than declaring that B.B. has an Autism Spectrum Disorder. On this issue, the school district is swimming upstream. The IHO and BSEA agreed on the issue, and the Seventh Circuit has written that courts applying the IDEIA should worry more about whether the child is receiving an

appropriate education than whether the experts have applied the right label to the child's condition. *Heather S.*, 125 F.3d at 1055.

The IHO found that Autism Spectrum Disorder was not the appropriate identification for B.B.:

> The preponderance of the evidence established that the student's area of eligibility for special education and related services is Other Health Impairment. The March 2, 2006 CCC made this determination based upon its review of various evaluations, documents, and input from committee members. The school is merely requesting this Hearing Officer to second guess the CCC. No matter, as raised by the Petitioners, the 7th Circuit Court of Appeals noted that "the IDEA concerns itself not with labels but with whether a student is receiving FAPE . . . . The IDEA charges the school with developing an appropriate education, not with coming up with a proper label with which to descibe [a student's] disabilities." *Heather S. v. Wisconsin*, 125 F.3d 1045 (7th Cir. 1997). Further, the most recent private evaluations make questionable an eligibility determination for ASD of the student. As ordered hereinafter, the parties will be convening for a case conference to develop an IEP for the student. There the CCC can review all evaluations, documents and records to determine the student's eligibility exceptionality. This Hearing Officer believes the proper exceptionality determination is OHI.

AR 124. The IHO issued Order 4, which stated: "The CCC shall determine the student's area of eligibility for special education, with the specific label not to be the concern, but rather the specific special education services the student needs. Other Health Impairment does appear appropriate, based on all evaluations and records." AR 125.

The BSEA stated in its findings of fact and conclusions of law:

> Because the IHO has already concluded that the student's area of eligibility for special education and related services is Other Health Impairment (OHI), the requirement in Order No. 4 for the case conference committee to determine the student's area of eligibility is not supported by the IHO's findings of fact and conclusions.

AR 37.  The BSEA therefore revised Order 4 to read:  "The CCC shall be concerned not so much with the specific label, but rather the specific special education services the student needs.  Other Health Impairment does appear to be the appropriate area of eligibility based on all evaluations and records."  AR 38.

The parties disagree as to whether it was proper for the BSEA to include the statement that the Committee should attach greater importance to identifying the specific needs of the student than to selecting a specific label for B.B.  One might reasonably wonder why the parties have devoted so much attention to the label issue, especially in light of the Seventh Circuit's comment in *Heather S.*:

> In any event, whether Heather was described as cognitively disabled, other health impaired, or learning disabled is all beside the point. The IDEA concerns itself not with labels, but with whether a student is receiving a free and appropriate education. A disabled child's individual education plan must be tailored to the unique needs of that particular child. . . .  The IDEA charges the school with developing an appropriate education, not with coming up with a proper label with which to describe Heather's multiple disabilities.

125 F.3d at 1055 (internal citations omitted).

Labels can have real consequences in this field, as the parties have shown here.  The parents do not want their child labeled as falling on the autism

-17-

spectrum, which they have repeatedly made clear to the school district.   In addition to feeling that autism is an inappropriate label for their son, they likely also want to avoid the stigma that can be associated with the "autism" label.  The school district contends that although its primary obligation is to provide students with a free appropriate public education, the identification through which the student is eligible for special education services has important consequences.  Indiana schools receive different levels of state funding to educate each identified student, depending on the identification categories of the students.  The Indiana legislature has set the rate of funding for special education students in 2008 at $531 per student in programs for communication disorders, $2250 per student in programs for mild and moderate disabilities, and $8,300 per student in programs for severe disabilities.  Ind. Code § 20-43-7-6.  The school district would like to classify B.B. as having an Autism Spectrum Disorder because it believes the diagnosis is correct and would enable the school district to receive more funds with which to educate him.

A court can recognize these consequences but still doubt that its judicial review should worry about labeling issues.  As the Seventh Circuit explained in *Heather S.*, the issue under the statute is whether the school district is providing an appropriate education to the child, which may or may not be affected by whether the diagnosis or label is correct.  The court sees no error in the BSEA's statement that the school district should place more attention on the student's needs than on selecting the appropriate label.

With respect to the second part of Order 4, the school district argues that the IHO erred in concluding that Other Health Impaired ("OHI") was the appropriate eligibility requirement.   The school district contends that there is evidence in the record that demonstrates that B.B. meets the definition of Autism Spectrum Disorder under Indiana Law.   See 511 Ind. Admin. Code § 7-26-2(a). Additionally, the school district argues that B.B. does not meet the requirements for an OHI identification under Indiana law because his parents have not submitted the required written diagnostic statement by a physician that describes the health impairment.   See 511 Ind. Admin. Code § 7-26-12(b)(4).   These arguments ask this court to re-weigh evidence when there was no challenge to the factual findings.   The Committee and the hearing officer found that Autism Spectrum Disorder was not the proper identification.   This conclusion is supported by Dr. Bubp's testimony at the impartial hearing and in his written report, in which he stated that B.B. did not meet the diagnostic criteria for an Autism Spectrum Disorder.   AR 842-3, 1086.   The IHO stated that, in his belief, the student's area of eligibility was OHI.   However, the IHO left it up to the Committee to make the  final determination of B.B.'s eligibility identification at the case conference.

The BSEA correctly recognized that the IHO had found by a preponderance of evidence that "Other Health Impairment" was the correct classification.   The BSEA's minor modification of Order 4 was not erroneous and would not preclude

the Committee from continuing to review B.B.'s area of eligibility.  The court sees

no reason to modify the BSEA decision with respect to Order 4.


II.     *Compensatory Education*

The school district next challenges the IHO's Order 11, which ordered the

school district to provide ten hours of compensatory occupational therapy as a

result of delays in implementing the IEP for B.B.  In his conclusions of law, the

IHO stated:

> The preponderance of the evidence established that the school did fail to
> provide appropriate and timely occupational therapy.  The school's
> occupational therapist, in her evaluation of April 20, 2005, proposed thirty
> minutes per month of OT consult services with the student's teachers and
> staff.  The parents did not agree to the proposed IEPs on April 22, 2005 and
> May 24, 2005, which included such OT consult services.  This refusal was
> due to a disagreement over the student's eligibility as being a student with
> ASD.  However, the school should have started then to provide the OT
> consult services, but it failed to do so until November 15, 2005, after the
> November 11, 2005 case conference.  Further, there were no OT goals
> developed at the November 11, 2005 case conference.  OT goals were
> subsequently drafted and provided to the parents in December, 2005.  On
> January 12, 2006 the parents met with the school's OT and provided her
> with comments to the OT goals.  Although the parents agreed on March 19,
> 2006 to OT services, the LEA did not begin providing the services until after
> April 12, 2006.

AR 120-21.  Based on these findings, the IHO drafted Order 11:  "The parents'

request for compensatory OT through the LEA's occupational therapist is hereby

granted, with the student to receive 10 hours of OT, with the CCC to determine

the specific frequency and duration of OT to make up these hours."  AR 126.  The

BSEA upheld this order, simply stating:  "The findings of fact and conclusions of law support Order No. 11."  AR 38.

The school district does not dispute that it failed to provide all of the occupational therapy in a timely fashion.  See AR 204 (letter by school district stating:  "The only exception to the provision of an appropriate education was the failure of RISE to provide OT services in a timely fashion.").  Instead, the school district argues that the BSEA erred when it upheld the award of compensatory education because compensatory education is available only when there has been a failure to provide a free appropriate public education.  The school district argues that the IHO found that the school district had provided B.B. with a free appropriate public education, see AR 123, so an award of compensatory education was contrary to the law.

If the school district's argument were correct, a school district could draft a detailed and elegant IEP, choose to ignore parts of it, and resist any remedy unless the child and his parents could show that the failures were in fact causing serious educational harm to the child.  To meet that standard, what should be a simple procedure to correct a relatively modest (and undisputed) failure would turn into a global debate about the overall success of the child's educational program.  Instead, the Supreme Court has made it clear that a school district must comply with a child's IEP to provide a free appropriate education.  *Rowley*, 458 U.S. at 188-89 (definition of "free appropriate public education" requires that

instruction and services "comport with the child's IEP"); *id.* at 203 (to provide free appropriate public education, child's "instruction and services . . . must comport with the child's IEP"); see also 71 Fed. Reg. 46,540, 46,553 (Aug. 14, 2006) (statement by the Office of Special Education and Rehabilitative Services, Department of Education that "providing services in conformity with a child's IEP in the [Least Restrictive Environment] is implicit in the definition of FAPE").

In *Evanston Community Consolidated School District No. 65 v. Michael M.*, 356 F.3d 798 (7th Cir. 2004), the Seventh Circuit rejected a nearly identical argument. The school district objected to a modest award of compensatory services because the hearing officer had not made a finding of failure to provide a free appropriate public education. *Id.* at 803 (school district argues that "courts may order compensatory services under the IDEA only upon a finding that a school district failed to provide a FAPE"). Despite the IHO's finding that the school district had provided "an exemplary, inclusive educational program," the court upheld the hearing officer's award of compensatory education for a student who had received some of his services from an occupational therapist who was not fully licensed. *Id.* The court explained that hearing officers and courts have the authority to grant the full range of equitable remedies, including ordering compensatory education. The court held that the provision of services by a provider who had not met all of the state's licensing requirements was a violation of FAPE and that compensatory education was a proper remedy. *Id.*

Similarly, here, the IHO found that the school district had complied with many requirements of federal and state law, but that it had not provided occupational therapy in a timely fashion.  The school district does not dispute the fact that it did not provide occupational therapy for B.B. during some portions of the 2005-06 and 2006-07 school years, despite the fact that his IEP stated those services were necessary.  Surely, if a non-licensed service provider providing occupational therapy was a violation of FAPE in *Michael M.*, the school district's failure to provide any occupational therapy for those periods of time was a violation of FAPE.  The BSEA did not err in affirming Order 11.

III.    *Independent Evaluators and Service Providers*

   A.    *Order 2*

B.B. and his parents challenge the BSEA's decision to set aside a portion of Order 2.  The IHO's Order 2 stated:

> This case conference committee shall include, at a minimum, the student's current special education teacher, at least one of the student's general education teachers, the LEA's occupational therapist and speech/language therapist serving the student, the parents, the special education director, the private occupational therapist, speech/language pathologist, and neuropsychologist, who all recently evaluated the student.

AR 125.  The school district objected, and the BSEA modified Order 2:  "To the extent that Order No. 2 requires the participation of private providers or other individuals not required by 511 Ind. Admin. Code 7-27-3(a), it is unsupported by

the findings of fact and conclusions of law." AR 38.  The BSEA revised the portion of the Order that discussed the private evaluators, stating:  "The parents may invite, at their own expense, the private occupational therapist, speech/language pathologist, and neuropsychologist, who all recently evaluated the student." *Id.*

The parents argue that the BSEA erred in striking the section of Order 2 that required the attendance of the private evaluators at the CCC meeting.  The parents' first argument is that the school district agreed to pay for the private evaluations, which includes the "full cost" of the evaluations.  34 C.F.R. § 300.502(a)(3)(ii).  They contend that the "full cost" of an evaluation includes paying for the evaluators to attend the conference to explain their findings and recommendations to the Committee.

The full cost of an independent evaluation does not include the cost of paying for the parents' chosen independent evaluators to attend conferences.  The regulations require the school district to consider the results of an independent evaluation in any decision made with respect to providing the student with FAPE. 34 C.F.R. § 300.502(c)(1).  Neither the regulation that discusses independent evaluations nor the regulation that discusses the composition of the Committee requires independent evaluators to be present at the meetings.  See 34 C.F.R. §§ 300.502, 300.321(a).

The parents also argue that even if the law does not require the school district to pay for the evaluators to attend the Committee meetings, the hearing officer had the authority to order this remedy if he found it necessary. They argue that it is necessary for the private evaluators to attend the meetings because no other members of the Committee are qualified to interpret the evaluators' opinions.

Neither the IDEIA nor the implementing regulations discuss the types of relief a hearing officer can award. The IDEIA states that a court can grant "such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C)(iii). Other courts have found that a hearing officer's ability to award relief is coextensive with that of a court's. See, *e.g.*, *Cocores v. Portsmouth, N.H., School District*, 779 F. Supp. 203, 205-06 (D.N.H. 1991) (finding that hearing officer has authority to award compensatory education); *S-1 v. Spangler*, 650 F. Supp. 1427, 1431-33 (M.D.N.C. 1986) (finding that hearing officers have the authority to order LEA to reimburse parents), *vacated as moot*, 832 F.2d 294 (4th Cir. 1987); see also *Ivan P. v. Westport Board of Education*, 865 F. Supp. 74, 80 (D. Conn. 1994) (discussing June 17, 1994 Policy Letter issued by Department of Education, Office of Special Education and Rehabilitation Services stating that hearing officers have the same authority to award the same forms of relief that courts have). The impartial due process hearing is the cornerstone of the series of procedural safeguards the IDEIA creates for parents. *Cocores*, 779 F. Supp. at 206. The IHO

has the broad authority to award remedial relief that is necessary to address violations of the IDEIA.

Here, neither party asked the hearing officer to decide who should attend the Committee meetings.  The hearing officer found that the school had not failed to devise programming based on the student's individual learning style.  Hearing office Graft wrote:  "Through various techniques and methodologies, the various teachers of the student addressed the student's needs as a visual learner, attention problems, auditory processing problems, organizational problems, and sensory integration problems."  AR 120.  There was no finding of a violation of federal or state law with regard to the creation of the student's IEP.

Cathy Weinmann, the private speech/language pathologist who evaluated the student, testified at the hearing that she had attended at least one of B.B.'s Committee meetings.   AR 891.   She testified that she frequently attends conferences with clients to present testing results and to provide recommendations.  AR 900.  She noted that she was concerned that the school's speech pathologist had questioned whether the results of the tests Weinmann had administered indicated an auditory processing problem.  AR 901.  Weinmann expressed concern that the school's expert did not believe that central auditory processing disorders, like the one she had identified in B.B., really exist. Weinmann feared that the school's speech pathologist would not recommend auditory therapy that she believed the student needed.  AR 902-03.

Collette Chinyerere, the private occupational therapist who evaluated B.B., also testified at the hearing.  She stated that she observed the student in his classroom and found that the teachers were not using many of the available tools. She opined that the student's third grade teacher was not knowledgeable about sensory integration but was receptive to learning about it.  AR 945-46.

The court concludes that the BSEA did not err by setting aside this portion of the hearing officer's Order 2 and ordering that the parents could invite the specialists to attend Committee meetings at the parents' expense.  The regulations require the attendance of an individual who can interpret the instructional implications of evaluations at each IEP meeting.  34 C.F.R. § 300.321(a)(5).  The court has examined the reports of the private evaluators.  Each report contains a summary of test results, interpretations of test scores, and recommendations of what could be done to address the student's needs in the classroom and what types of direct services are necessary.  AR 1246-51, 1255-61; 1303-09.  The parents and the other members of the Committee should be able to interpret the reports.  If the parents are concerned that the reports or recommendations will not be understood, they have the right to invite anyone who has knowledge or special expertise regarding the child to attend the conference.  34 C.F.R. § 300.321(a)(6).[2]

---

[2]To the extent the hearing officer's Order 2 might be understood as ordering the particular experts to attend the Committee meeting, it would have been erroneous.  The IHO does not have the authority to order individuals who are not parties to the due process hearing to do anything, including attend a Committee meeting.  See *McManus v. Wilmette School District 39 Board of Education*, 1992 WL 368055, at *2 (N.D. Ill. Nov. 30, 1992) (discussing earlier dismissal of case (continued...)

B.    *Order 6*

The parents also challenge the BSEA's modification of Order 6.  The hearing

officer had ordered:

> The student's need for private SLT [speech and language therapy] and OT
> [occupational therapy] and for a behavioral psychologist shall be the
> responsibility of the parents.  However, these private providers should meet
> periodically, perhaps monthly, with the student's LEA providers, including
> a general education teacher, special education teacher, occupational
> therapist and speech/language pathologist.  The Petitioner's proposal for a
> case manager and part time para-professional for the student should be
> considered by the CCC.

AR 125.  The school district challenged this Order, and the BSEA agreed that

Order 6 was erroneous:  "The findings of fact and conclusions of law do not

support an order for the School to require the private providers to meet

periodically, perhaps monthly, with the School's providers.  Although this might

be ideal, such is not required by Article 7."  AR 38.  The BSEA revised Order 6 so

that it states only:  "The student's need for private SLT and OT and for a behavior

psychologist shall be the responsibility of the parents."  *Id.*

The court finds no error in the BSEA decision on Order 6.  As discussed

above, the hearing officer and BSEA have broad authority to award remedial relief

that they find necessary to remedy violations of the IDEIA, but they do not have

the authority to order non-parties to act in a particular way.  Some testimony at

---

[2](…continued)
because party against whom any remedies would have been ordered was not a
party).

the hearing indicated that the teachers and other school staff were not trained properly with regard to working with students with auditory processing problems and/or sensory integration problems.   See AR 902-03, 945-46.   The court assumes that the hearing officer relied on this testimony when he ordered the school staff to consult with the private service providers on a regular basis. However, as noted above, the hearing officer also found that the school district had devised programming that was appropriate for B.B.'s needs.  AR 120.  Having found no violation of federal or state law with regard to programming, it was not necessary to order any remediation.   There is no indication that it would be necessary for the school to arrange or pay for the private service-providers to meet with school staff.

To the extent that the hearing officer ordered the Committee to consider the parents' proposal for a case manager and part time para-professional, the Order is not necessary.  The IEP team is required to consider information about the child provided by the parents and any available information about the child's anticipated needs.  34 C.F.R. § 300.324(b)(1)(ii)(C&D).  The parents therefore have the ability to propose a case manager and part time para-professional at any IEP meeting.  The BSEA did not err in revising Order 6.

C. *Order 8*

The parents also challenge the BSEA's decision to modify the hearing officer's Order 8, which stated:

> The student's IEP shall include necessary in-service training of the student's general education and special education teachers, his occupational therapist and speech/language pathologist in his exceptionality, provided this is OHI or ASD, and specific in-service training addressing how the student's exceptionality, as manifested, adversely affects his educational performance. The LEA should contact the private occupational therapist and speech/language pathologist and ask them to participate in the presentation of this in-service training. This in-service training shall include training on use of a sensory diet, which shall be drafted by the LEA's occupational therapist and the student's private occupational therapist. The private occupational therapist and LEA's occupational therapist shall periodically oversee the general education and special education teachers to assure that they are using the sensory diet appropriately.

AR 125-26. The BSEA stated: "To the extent that Order No. 8 requires the School to utilize specific private therapists or other providers to provide training to school personnel it is unsupported by the findings of fact and conclusions of law." AR 38. The BSEA revised Order 8 to read:

> The student's IEP shall include necessary in-service training of the student's general education and special education teachers, his occupational therapist and speech/language pathologist in his exceptionality area of OHI, and specific in-service training addressing how the student's exceptionality, as manifested, adversely affects his educational performance.

Id.

The parents argue that the teachers and other service providers were not trained adequately to deal with B.B.'s needs. Several teachers and service

providers testified at the hearing that they had not received in-service training with regard to Other Health Impairment before they started working with B.B.  AR 508, 546, 573.  The parents also rely on the hearing officer's finding that the school staff was not trained in OHI or B.B.'s specific needs as discussed at the March 19, 2006 meeting.  They contend that the hearing officer had the authority to order additional training provided by the chosen private therapists.

The school district argues that B.B. was never classified officially as Other Health Impaired.  Though B.B.'s father signed the IEP that classified B.B. as Other Health Impaired, he stated specifically that he did so only so that B.B. would receive services.  Thus, the school district contends that there was no consent to the change of classification and the requirement that the school staff be trained in OHI was never triggered.  The court disagrees on this point.  The hearing officer found, and the BSEA affirmed, that B.B. was properly classified with OHI.

Regardless of whether the school staff had appropriate training to work with a student who was classified as Other Health Impaired, the hearing officer's uncontested findings show that the school staff had not received adequate training to meet B.B.'s needs.  The private evaluations showed auditory processing problems, sensory integration problems, and attention deficits.  Staff members testified they were not trained in those areas prior to starting to work with B.B. AR 546-51, 573-74.  B.B.'s second grade reading teacher testified that she had not reviewed his IEP before she began teaching him and was not aware of any of his

goals.  AR 639.  The hearing officer and BSEA did not err in concluding that additional training was necessary.

The BSEA also did not err by modifying Order 8 to remove the requirement that the school district use particular service providers.  Neither the federal nor the state law requires training by a specific service provider.  Cathy Weinmann, the private speech/language pathologist, testified that she had offered to do in-service training for the school at no cost, and she would be willing to provide this training at any time.  AR 909.  Collette Chinyerere, the private occupational therapist, testified that she would be willing to help plan a sensory diet and train teachers and other staff in how to implement it.  AR 956.  The school district may be interested in contacting these professionals to discuss the possibility of them providing in-service training.  However, the BSEA did not err in striking the portions of Order 8 that *required* the school district to contact these particular professionals, no matter how skilled and dedicated they are, and no matter how sensible (and cost-effective) such a course might be in this case.

IV.    *Goals and Objectives*

A.    *Order 3*

The parents object to the BSEA's decision to strike Order 3 of the hearing officer.  Order 3 stated:  "The student's goals and objectives shall be precise,

specific, and measurable in all areas this CCC deems appropriate to meet the student's needs." AR 125.  The BSEA stated:

> Order #3 is not supported by the conclusions of law.  The IHO properly concluded that the School did not fail to devise IEPs containing appropriate and measurable goals and objectives in all the Student's areas of need and based on present levels of performance.

AR 37.  The BSEA struck Order 3 in its entirety.  AR 38.

As discussed above, the IHO has the broad authority to award remedies that he deems necessary in response to a violation of federal or state law.  Here, the IHO concluded that the school did not fail to devise IEPs containing appropriate and measurable goals and objectives in all the student's areas of need.  AR 122. He stated that a preponderance of the evidence established that the majority of goals and objectives in the student's IEP were appropriate and measurable.  The parents had argued that the goals were vague.  The IHO stated:  "Although the various goals and objectives could have been more detailed, more specific and more measurable, that is not the test.  511 Ind. Admin. Code 7-27-6(a)(2) sets forth the standard and the school met this standard."  AR 123.

Both federal and state law require the school district to set measurable goals for special education students.  The IDEIA requires each IEP to include a statement of measurable annual goals designed to meet the student's needs and enable the student to make progress in the general education curriculum.

20 U.S.C. § 1414(d)(1)(A)(i)(II).   Indiana law requires each IEP to include a statement of measurable annual goals that describe what the student is expected to accomplish, including benchmarks or short-term objectives.  511 Ind. Admin. Code § 7-27-6(a)(2).

Because the IHO found no violation of federal or state law related to setting objective, measurable goals, he did not have the authority to order a remedy relating to devising goals in the IEP.  Order 3 simply restated the obligations the school district has under federal and state law to devise measurable annual goals. Such a restatement might have been appropriate if the school district had been violating these requirements, but the hearing officer found no such violations. The BSEA did not err in striking Order 3 in its entirety.

B.    *Order 5*

The parents also object to the BSEA's decision to strike the hearing officer's Order 5, which had stated:

> It appears the student needs school SLT and OT as related services to meet his educational needs and the same shall be addressed in his IEP, with the recommendations of the private occupational therapist and speech/language pathologist to be strongly considered, since these recommendations as to in-school therapy appear appropriate.

AR 125.  The BSEA stated:

> Order No. 5 is not supported by the conclusions of law.  The School and the parents did agree on goals and objectives for occupational therapy and speech therapy services.  The need for an order to provide such is not supported by the findings of fact and the conclusions.

AR 37.

The BSEA erred to the extent that it concluded that the parties had agreed on goals and objectives for occupational therapy and speech and language therapy in the March 2006 IEP.  The IHO found that the Committee presented goals and objectives in the areas of math, reading, writing, social behavior, and speech language at the March 2, 2006 case conference.  The parents requested time to review the goals and objectives.  On March 17, 2006, the case conference was reconvened and the father expressed concern about the goals and objectives.  AR 111.  The transcript from that conference reflects that the father met with several staff members to discuss how to define whether the student was meeting the goals and objectives that were included in the IEP.  AR 1628-43.  They seemed to come to an agreement on how the goals and objectives would be revised.  AR 1638.  The father signed the revised IEP a few days later so that services would start, but stated explicitly that he did not approve of "the incomplete manner in which this IEP has been filled out . . . ."  AR 1538.  Thus, the parents and the school district had not agreed on goals and objectives in March 2006.

However, Order 5 did not discuss the goals and objectives portion of the IEP; it simply discussed the need for occupational therapy and speech and language therapy services and required the Committee to consider the private evaluations

in designing a program for B.B.  Both sides agree that B.B. needs in-school occupational therapy and speech and language therapy services.  Federal and state law require the Committee to set goals and objectives in the IEP that describe what the student can be expected to accomplish within a twelve month period and that are designed to meet the student's needs.  20 U.S.C. § 1414(d)(1)(A)(i)(II); 511 Ind. Admin. Code 7-27-6(a)(2).  As discussed above, the IHO found that the school had not failed to devise IEPs containing appropriate and measurable goals and objectives.  AR 122.  Federal regulations require the IEP team to consider the results of independent evaluations in any decision made with respect to providing the student with a free appropriate education.  34 C.F.R. § 300.502(c)(1).  There is no indication that the Committee failed to consider the results of any independent evaluations in making decisions regarding the services B.B. needed.  Thus, Order 5 did not provide the parents with anything to which they were not already entitled by law or to which the school district had not already agreed.  The BSEA did not err in striking Order 5 in its entirety.

V.    *Extended School Year*

The parents also object to the BSEA's decision to strike the hearing officer's Order 7, which had ordered consideration of an extended school year ("ESY"):

> An additional case conference shall be held in late April to early May, 2007 to consider the student's need for extended school year for the Summer, 2007, with consideration for using a summer computer program such as Fast ForWord with the student, if the student's need for ESY has been demonstrated and determined by the CCC.

AR 125.  The BSEA stated:  "There was no determination that the School failed to appropriately address extended school year services (ESY).  The findings of fact and conclusions of law do not support Order No. 7."  AR 38.  The BSEA struck Order 7 in its entirety.

The parents' challenge to the decision to strike Order 7 is moot.  The Seventh Circuit explained the application of mootness doctrine to IDEA cases in *Brown v. Bartholomew Consolidated School Corp.*, 442 F.3d 588, 596 (7th Cir. 2006) (dismissing IDEA case as moot where parents had moved child to different school district and agreed to a new IEP).  Article III of the U.S. Constitution limits the court's jurisdiction to actual, ongoing cases or controversies.  The court cannot provide opinions upon moot questions or abstract propositions.  *Lewis v. Continental Bank Corp.*, 494 U.S. 472, 477-78 (1990).  It is not enough for a dispute to be alive at the time the suit was filed, the parties must continue to have a "personal stake in the outcome of the lawsuit" through all stages of the proceedings.  *Id.*  If an issue presents no live controversy, it is moot and the court must dismiss it as non-justiciable.  *Id.*  One exception to the mootness doctrine is a dispute that is "capable of repetition, yet evading review."  To fall within this exception, the injury must be of inherently limited duration and there must be a reasonable expectation that it would befall the same complaining party again.  *Murphy v. Hunt*, 455 U.S. 478, 482 (1982).

Order 7 addressed a case conference that should have taken place in April or May of 2007 regarding services to be provided in the summer of 2007. The summer of 2007 has come and gone, making this issue moot. See *Board of Education of Downers Grove Grade School District No. 58 v. Steven L.*, 89 F.3d 464, 467-68 (7th Cir. 1996) (holding claim was moot where IEP at issue related to child's fifth grade education and he had finished fifth grade and the parents had signed a new IEP). This issue does not fall into the "capable of repetition, yet evading review" exception because federal and state law require the Committee to consider periodically whether extended school year services are necessary. Extended school year services must be made available to students to the extent necessary to provide a free appropriate public education. 34 C.F.R. § 300.106(a)(1). The Committee must document whether the student is eligible for extended school year services each time it creates or modifies the student's IEP. 511 Ind. Admin. Code 7-27-6(a)(8). The IHO found that the school district did not fail to provide appropriate extended school year services for B.B. AR 120. There is no reason to believe that the Committee would fail to consider whether extended school year services may be necessary for B.B. in the future.

*Conclusion*

As discussed in detail above, the court affirms the BSEA's revisions of Orders 4, 11, 2, 6 and 8. The court also affirms the BSEA's decision to strike Orders 3 and 5 in their entirety. The issues raised in Order 7 are moot and

therefore not justiciable.  Accordingly, plaintiffs' motion for summary judgment (Docket No. 43) is granted to the extent it seeks to uphold the decision of the BSEA and denied to the extent it seeks to reverse or modify the decision of the BSEA.  Defendants' motion for summary judgment (Docket No. 47) is granted to the extent it seeks to uphold the decision of the BSEA and denied to the extent it seeks to reverse or modify the decision of the BSEA.  The court will confer with counsel regarding the next steps to resolve remaining issues, including the parents' claim for an attorney fee award.


So ordered.

Date: July 11, 2008

_____
DAVID F. HAMILTON, CHIEF JUDGE
United States District Court
Southern District of Indiana


Copies to:

Seamus P. Boyce
CHURCH CHURCH HITTLE & ANTRIM
spboyce@cchalaw.com
belinda@cchalaw.com

Kyle A. Jones
NORRIS CHOPLIN & SCHROEDER LLP
kjones@ncs-law.com

Dorene Jackson Philpot
dphilpotlaw@alumni.indiana.edu

Martin E. Risacher
CHURCH CHURCH HITTLE & ANTRIM
risacher@cchalaw.com
lwolverton@cchalaw.com